UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

| | |
|---|---|
| LENARD DIXON,<br><br>    Petitioner,<br><br>V.<br><br>C. GOMEZ, Warden,<br><br>    Respondent. | Civil Action No. 6: 21-24-KKC<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

In 2016, a federal prison officer observed inmate LeNard Dixon masturbating in his cell. The officer ordered Dixon to stop, but he refused. Dixon was charged and convicted of a prison disciplinary offense, resulting in the loss of good conduct time. Dixon now challenges the procedures used to convict him. But Dixon did not exhaust his claims prior to filing suit, and prison officials committed no error of constitutional magnitude during disciplinary proceedings. The Court therefore denies relief.

I.

Dixon is currently confined at a federal penitentiary in Kentucky. While detained at a prison in Colorado in July 2016, a female prison officer saw Dixon inside his cell masturbating. The officer gave Dixon a direct order to stop, but he did not. The officer issued Incident Report 2869253 charging Dixon with Engaging in a Sexual Act (a Code 205 offense) and Refusing an

Order (a Code 307 offense). [R. 9-1 at 14] Dixon alleges that he immediately asked several officers to preserve pertinent video footage. [R. 1-2 at 2]

An investigation of the events was conducted hours after Dixon was charged. At that time, Dixon told the investigating lieutenant to "Check the video. I have no comment." [R. 9-1 at 15] In his investigation report, the lieutenant noted that "Inmate DIXON did request a camera review. (A review of video footage was conducted, SIS notified and video saved, see description below)." *Id*. However, the investigating officer noted that:

> A review of video camera footage from the CB Housing Unit during the time of this allegation, does NOT show any direct video footage of the location of incident nor any area immediately surrounding nor adjacent. Video footage review is therefore inconclusive as there is no relevant footage to review.

[R. 9-1 at 14-15] Dixon now argues that the investigating officer lied because, he contends, the video must have shown that the reporting officer was never even near his cell at the time she claimed to have been. [R. 1-2 at 3-4] The investigation report was completed the same day. [R. 9-1 at 15] The next day Dixon was given a form advising him of his rights at the DHO hearing, including the right to present evidence. He was also given a form to indicate any witnesses he wished to call or evidence to present. Dixon did not list any witnesses or identify any evidence he wished to present, and refused to sign either form. [R. 9-1 at 16-17]

The charges were initially processed by a Unit Disciplinary Committee ("UDC"). The UDC, noting that Dixon has an established history of such behavior and other serious

2

disciplinary violations,[1] referred the matter to a Disciplinary Hearing Officer ("DHO") with a recommendation that sanctions be imposed. Dixon was given notice that the DHO would hold a hearing on the charges and was advised of his rights. Prior to the DHO hearing, Dixon requested that a staff member represent him at the hearing, but indicated that he did not want to present witnesses. [R. 9-1 at 14-18]

Approximately five weeks later in August 2016, the DHO held a hearing on the charges. During the hearing Dixon asked the DHO to review the video footage, but the DHO indicated that the video "was no longer available due to the passage of time when you made the request to your staff rep." Following the hearing, the DHO found Dixon guilty of Engaging in a Sexual Act, but dismissed the charge for Disobeying an Order. The DHO imposed various sanctions including the loss of good conduct time. [R. 9-1 at 19-21] Dixon appealed, contending that he had requested review of video footage all along, including during the investigation, to the UDC, and to his staff representative. The North Central Regional Office concluded that a "procedural error" had been discovered during the proceedings (although it did not identify

---

[1] By the time of these events, Dixon already had one prior disciplinary conviction for being in an unauthorized area, one conviction for indecent exposure, one conviction for refusing to take an alcohol test, three convictions for refusing a work assignment, seven convictions for refusing to obey an order, four convictions for engaging in a sexual act, one conviction for being insolent to staff members, three convictions for possessing an unauthorized item, one conviction for threatening bodily harm, seven convictions for possessing a dangerous weapon, and seven convictions for possessing intoxicants. Dixon was also convicted of several more offenses of this kind after the conviction at issue in this matter. [R. 9-1 at 34-45]

what that error was), and remanded the matter to the DHO for reconsideration. [R. 9-1 at 22-24]

The DHO held a new hearing in November 2016. At the hearing Dixon waived his right to 24 hours notice before the hearing. The DHO expressly noted in his report that the investigator had stated that video footage was reviewed but was inconclusive regarding Dixon's guilt or innocence because the camera was not pointed towards Dixon's cell or anywhere nearby. Dixon offered no countervailing testimony or evidence. The DHO found Dixon guilty of Engaging in a Sexual Act and imposed various sanctions including the same disallowance and forfeiture of good conduct time. [R. 9-1 at 25-30]

Following the hearing, a guard brought Dixon back to the hearing room. Two prison guards later provided statements indicating that it was Dixon who requested to be taken back to the hearing room. When the DHO told Dixon that the hearing was over and attempted to move Dixon out of the doorway to close the door, Dixon spat in the DHO's face. [R. 9-1 at 29-30] Dixon contends that the DHO and both guards are lying, stating that it was the DHO who called him back to the room, and that once there the DHO pushed him repeatedly and then hit him with the door. [R. 1-2 at 5-6] An Incident Report was issued charging Dixon with "assault without injury" for spitting in the DHO's face, conduct he would later admit to committing. [R. 9-1 at 4; R. 11-1 at 27-30]

Dixon again appealed his disciplinary conviction for Engaging in a Sexual Act, alleging that the DHO assaulted him after the hearing and held the hearing without his staff

4

representative present. The North Central Regional Office again concluded that an unidentified procedural error had been discovered during the proceedings, and remanded the matter to the DHO for corrective action. [R. 9-1 at 45-47]

The DHO held a third hearing in March 2017. Dixon was given advance notice of the hearing and his rights with respect to it, but Dixon refused to acknowledge those notices. Dixon refused to participate in the hearing. [R. 9-1 at 48-52] While Dixon had denied the charges, he again did not present any evidence or testimony at the hearing. The DHO noted in his report that at the prior hearings the camera footage was inconclusive because the video did not cover the area where the events transpired. The DHO therefore again found Dixon guilty of Engaging in a Sexual Act and imposed sanctions including the loss of 27 days good conduct time. [R. 9-1 at 53-56] The DHO Report was delivered to Dixon on May 24, 2017. [R. 9-1 at 33]

II

Dixon filed administrative appeal 899161-R1 challenging his March 2017 disciplinary conviction, but his appeal was rejected because he filed it in the wrong office. *See* [R. 9-1 at 59] Dixon failed to correct the error as directed. Instead, he filed his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in this Court challenging the imposition of disciplinary sanctions against him. [R. 1] Dixon contends that: (1) the DHO violated his due process rights by refusing to review and consider video footage of the incident, which Dixon contends is exculpatory; (2) he was subjected to double jeopardy because he committed a single

5

offense but was allegedly sanctioned at each of the three DHO hearings, and because his spending at the commissary was curtailed after he refused to voluntarily pay the $21.00 fine; and (3) the DHO was not impartial because the third hearing was conducted without his staff representative present, because he was allegedly sanctioned with the loss of commissary privileges for "a near century";[2] and because he was not given a written statement of the reasons for his decision.[3] [R. 1 at 6-7; R. 1-2 at 6-13]

The government counters that Dixon's petition must be denied because he did not exhaust his administrative remedies and, in any event, the disciplinary proceedings were

---

[2] The DHO imposed a $21.00 fine as part of his disciplinary sanctions. When Dixon refused to voluntarily pay the fine, BOP officials imposed limitations upon Dixon's commissary spending until "12/31/2100." *See* [R. 1-2 at 4] This consequence was not ordered by the DHO as a disciplinary sanction. *See* [R. 9-1 at 55] Instead, BOP officials merely implemented established policy. *See* BOP Program Statement 5270.09 (July 8, 2011) (Sec. E at 15) ("Commissary privileges should be suspended until the fine is paid.") & App. C (noting that while inmates "have the right to use your funds for commissary and other purchases," they also "have the responsibility to meet your financial and legal obligations, including, but not limited to, DHO and court-imposed assessments, fines, and restitution."). This collateral consequence, which was not part of the disciplinary proceedings and resulted from Dixon's own actions, is therefore not reviewable in this habeas corpus proceeding.

[3] At various points in his petition Dixon asserts that the DHO ordered that he forfeit 47 days of good conduct time. He further asserts that after the third hearing, the DHO increased the suspension of privileges for the commissary and telephone from 60 days to 180 days. *Cf.* [R. 1-2 at 10-11] The record disproves both contentions. BOP records clearly and consistently show that all of the sanctions imposed after the initial hearing, the first rehearing, and the second rehearing remained exactly the same. In each instance, the DHO ordered that Dixon be disallowed 2 days of vested good conduct time, that he forfeit an additional 25 days of non-vested good conduct time, that he spend 30 days in disciplinary segregation, that he lose commissary and phone privileges for 60 days, and that he pay a $21.00 monetary fine. *See* [R. 9-1 at 21 (Aug. 12, 2016 hearing); R. 9-1 at 27 (Nov. 4, 2016 hearing); R. 9-1 at 55 (Mar. 24, 2017 hearing)] These sanctions were not cumulated; they were imposed a single time.

conducted in a manner consistent with the due process protections to which Dixon was entitled. The government is correct on both counts, and Dixon's petition will be denied.

Dixon's petition must first be denied because he failed to exhaust his administrative remedies. Before a federal prisoner may seek habeas relief under Section 2241, he must exhaust his administrative remedies within the Bureau of Prisons. *Fazzini v. Northeast Ohio Correctional Center*, 473 F.3d 229, 231 (6th Cir. 2006); *Campbell v. Barron*, 87 F. App'x 577, 577 (6th Cir. 2004); *Leslie v. United States*, 89 F. App'x 960, 961 (6th Cir. 2004)("[I]t is well established that federal prisoners are required to exhaust their administrative remedies before filing a habeas corpus petition under § 2241."). Administrative remedies must be exhausted prior to filing suit and in full conformity with the agency's claims processing rules. *Woodford v. Ngo*, 548 U.S. 81, 92-94 (2006). The purpose of the exhaustion requirement is to ensure that the agency has an opportunity to review and revise its actions before litigation is commenced, which preserves both judicial resources and administrative autonomy, and also to ensure that a court reviewing the agency's final action does so upon a developed and complete evidentiary record. *Noriega-Lopez v. Ashcroft*, 335 F. 3d 874, 881 (9th Cir. 2003); *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 761-62 (3d Cir. 1996).

Ordinarily, a prisoner must first file an informal grievance as well as a formal grievance to the warden. 28 C.F.R. §§ 542.13(a), 542.14(a). But appeals from disciplinary sanctions are different, and are originally filed with the regional office assigned to oversee the prison where the inmate is housed at the time of filing. 28 C.F.R. § 542.14(d)(2). Dixon followed this rule

in his first two appeals. But after the April 2017 DHO conviction at issue, Dixon mailed his appeal to the wrong regional office. Dixon, who had been transferred to the federal penitentiary in Pollock, Louisiana, should have filed his appeal to the South Central Regional Office. When he instead appealed to the North Central Regional Office, that office rejected his appeal. [R. 9-1 at 59; R. 10-1 at 5-6] Dixon made no effort to re-file his appeal in the correct regional office as directed.

Instead, Dixon abandoned the grievance process and filed his petition in this Court. But a prisoner must exhaust his administrative remedies fully and properly, meaning in full compliance with the agency's deadlines and other critical procedural rules. *Woodford*, 548 U.S. at 90; *Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009). If a prisoner's grievance or appeal is rejected on procedural grounds and he is afforded the opportunity to cure the defect that led to the rejection, the prisoner must avail himself of that opportunity: he may not abandon further efforts at compliance. *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) ("An inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so."); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032-33 (10th Cir. 2002) (inmate failed to exhaust administrative remedies when he failed to cure the deficiency which led the prison to reject grievance appeal). Dixon's claims are therefore unexhausted because he abandoned the appeal process. His petition will be denied on that ground.

Dixon's petition will also be denied because the materials filed by the parties establish that he was afforded all of the process to which he was due. When a prisoner believes that he was deprived of sentence credits for good conduct without due process of law, he may invoke this Court's habeas corpus jurisdiction under 28 U.S.C. § 2241. *Preiser v. Rodriguez*, 411 U.S. 475, 487-88 (1973). Before such credits are taken, due process requires that the inmate be given:

(1) written notice of the charges against him at least 24 hours before the administrative hearing on the charges;

(2) a hearing before an impartial decision-maker;

(3) assistance from a competent inmate or staff member, if the inmate requests one and he will likely be unable to present a defense because he is illiterate or the case is too complex for him to comprehend;

(4) the opportunity to call witnesses and present documentary evidence, if doing so would not jeopardize institutional safety or correctional goals; and

(5) a written statement by the hearing officer explaining the evidence relied upon and the basis for the decision.

*Wolff v. McDonnell*, 418 U.S. 539, 564-70 (1974). The Bureau of Prisons has included these and even broader protections by regulation. *See* 28 C.F.R. §§ 541.5 - 541.8; BOP Program Statement 5270.09 (Nov. 2020).[4]

---

[4] An agency's failure to strictly comply with its own policies does not violate due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *United States v. Rutherford*, 555 F.3d 190, 192 (6th Cir. 2009) ("[T]he Constitution does not demand a bright-line rule whereby every breach of federal administrative policy also violates the Due Process Clause.").

Due process also requires the prison disciplinary board's decision to be supported by "some evidence" in the record. *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985). Because the quantum of evidence required to meet that standard is minimal, the reviewing court need not re-examine the entire record, independently assess the credibility of witnesses, or weigh the evidence. Instead, it need only confirm that "there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." *Id.* at 454-55 (emphasis added); *Selby v. Caruso*, 734 F. 3d 554, 559 (6th Cir. 2013).

These protections were afforded to Dixon. Before the hearing held in August 2016, Dixon was given advance notice of the charges against him, his request for a staff representative was granted, and he declined to request witnesses to testify on his behalf. [R. 9-1 at 16-18] Before the November 2016 rehearing, Dixon waived the 24-hour notice and declined the assistance of a staff representative and the testimony of witnesses on his behalf. [R. 9-1 at 25] Before the rehearing in March 2017, officers presented Dixon with the usual forms advising him of his rights, including to present witnesses and the assistance of a staff representative, but Dixon refused to sign the forms or to participate in the hearing at all. [R. 9-1 at 48-54] The DHO Report was delivered to Dixon after each of the three hearings. [R. 9-1 at 21, 28, 33]

---

The Court therefore analyzes only whether constitutionally-required protections have been afforded.

10

Dixon contends that the DHO violated his right to produce documentary evidence in his favor. Dixon specifically refers to video footage of the area around his cell at the time of alleged infraction. Dixon acknowledges that the footage no longer existed at the time of the DHO hearing, but complains that he asked for it to be preserved and asserts that it would have proved that the reporting officer never came by his cell. [R. 1-2 at 6-8]

Apart from Dixon's assertion, nothing in the record supports his contention that he requested that the video footage be preserved immediately after he was charged. Instead, the record substantiates only that Dixon requested a review of video footage (which was performed), not that he requested its preservation. Further, the video review as documented by the investigating lieutenant undermines Dixon's unsupported assertion that the video was exculpatory. When the DHO conducted his hearing five weeks later, he did not err in relying upon the lieutenant's statement to conclude that the video did nothing to disprove the reporting officer's charges against Dixon. *See generally Redmond v. Holland*, No. CIV.A. 15-30-DLB, 2015 WL 4167809, at *6 (E.D. Ky. July 9, 2015) ("... the DHO decision not to review video tape evidence does not constitute a denial of due process under *Hill* and *Wolff*.") (cleaned up); *McKeithan v. Beard*, 322 F. App'x 194, 201 (3d Cir. 2009) ("[T]he videotape and photographs at most constitute potentially exculpatory evidence, which prison officials have no constitutional obligation to preserve or consider."). And the DHO's determination that Dixon was guilty of the charged offense was supported by "some evidence" in the record, including the charging officer's statement. *See Flanigan v. Wilson*, No. 10-cv-111-GFVT, 2011

WL 5024432, at *6 (E.D. Ky. Oct. 20, 2011) ("A prison surveillance videotape allegedly containing exculpatory footage need not be presented at a hearing or reviewed by a disciplinary hearing officer in order to satisfy the 'some evidence' standard needed to uphold a disciplinary conviction."); *Craig v. Matevousian*, No. 20-5155, 2020 WL 4516009, at *1 (6th Cir. July 17, 2020) ("Even if the video might have been helpful to Craig, the hearing officer's reliance on the written report does not nullify the fact that the hearing officer's decision was supported by some evidence.").

Dixon also claims that the DHO was not an impartial decision-maker. Dixon first complains that the November 2016 rehearing was conducted without his staff representative present. [R. 1-2 at 11] But Dixon did not request a staff representative at this rehearing. [R. 9-1 at 25] He also repeats his complaint that the DHO did not review video footage. [R. 1-2 at 11] That ground fails for the same reasons stated above: the video footage had been reviewed; was found to be unhelpful; and was not maintained because Dixon did not ask for its preservation until long after it had already been overwritten.

Dixon also complains that the sanctions (other than good conduct time, which is required and determined by regulation) were too severe and were imposed only after he was charged with assaulting the DHO. [R. 1-2 at 11-12] As set forth in note three above, Dixon is simply wrong that his sanctions were increased after the second and/or third rehearing. Indeed, even after Dixon spat in the DHO's face, the DHO reached the same culpability determination as he had before, based upon the same evidence, and imposed the same sanction.

Dixon is also wrong, as explained in note two above, that the $21.00 monetary fine was applied more than once. Dixon also includes an extraneous complaint about an entirely different incident report he received for indecent exposure. [R. 1-2 at 13] That matter is not before the Court, nor does Dixon offer anything more than rank speculation that the two incidents were related.

In any event the government correctly notes that to show bias, Dixon must establish that the DHO had some personal or substantial involvement in the circumstances underlying the charge. *See Lewis v. Warden Canaan USP*, 749 F. App'x 98, 99 (3d Cir. 2019) (rejecting bias claim because "Lewis simply has provided no reason to believe that the DHO had a 'direct, personal, substantial, and pecuniary' interest in his case."); *Gwinn v. Awmiller*, 354 F. 3d 1211, 1220-21 (10th Cir. 2004). *See also* 28 C.F.R. § 541.8(b) (requiring only that the DHO not be "a victim, witness, investigator, or otherwise significantly involved in the incident" to preside). Dixon does not make the effort to establish that these criteria applied, and the record provides no support for the notion that the DHO was biased.

Finally, Dixon claims that he was subjected to "double jeopardy" because the BOP imposed the sanctions ordered by the DHO more than once. [R. 1-2 at 8-10] As a threshold matter, the Double Jeopardy Clause does not apply at all to prison disciplinary proceedings. *Cf. Kerns v. Parratt*, 672 F.2d 690, 691 (8th Cir. 1982) (holding that prison disciplinary proceedings "do not place an offender in jeopardy for purposes of the double jeopardy clause."); *Lucero v. Gunter*, 17 F. 3d 1347, 1351 (10th Cir. 1994) ("Prison disciplinary hearings are not

part of a criminal prosecution, and therefore do not implicate double jeopardy concerns."). And Dixon's grievance is not so much with the sanctions imposed by the DHO but with asserted administrative errors committed by the BOP in implementing them. But Dixon's contentions are simply incorrect. The government has established that Dixon lost the 27 days of good conduct time only once. [R. 9-1 at 5-6, 60] The privileges Dixon lost were served after the first DHO hearing, and were not imposed more than once. *Id.* at 33. And the monetary fine was deducted from Dixon's inmate account only one time, as is conclusively demonstrated by the newly-filed account statement Dixon relies upon in support of his claim.[5] The record therefore refutes the factual basis for this claim.

### III

---

[5] When Dixon refused to immediately pay the $21.00 fine in August 2016, his account was encumbered for that amount but no deduction was taken. [R. 11-1 at 39 (reference #4422)] Dixon agreed to pay the fine in October 2016. [R. 1-2 at 9] The encumbrance was released on November 7, 2016, with no effect on Dixon's account balance. [R. 11-1 at 39 (reference #4422)] The $21.00 fine was paid, and Dixon's balance reduced, in the line item immediately following. *Id.* at 40 (reference SJV00003).

Dixon contends that $26.00 was deducted from his account for this same disciplinary conviction in November 2016. Again the account statement proves this wrong. Following the November 4, 2016 rehearing, the DHO reimposed the same sanctions including the $21.00 fine. [R. 9-1 at 27] This amount was not deducted a second time because it had already been paid. [R. 11-1 at 40] On November 7, 2016, a $26.00 encumbrance was placed on Dixon's account. The statement provides no reason for the encumbrance, but again it did not affect his account balance. *Id.* (reference # 692). This $26.00 encumbrance was released one month later, again with no impact on the account balance. *Id.* In March and April 2017, a $21.00 encumbrance was again placed on Dixon's account, with no stated reason, and then removed two weeks later. *Id.* at 41 (reference # 2621). Neither the placement of the encumbrance nor its subsequent removal altered Dixon's account balance.

For all of the foregoing reasons, Dixon has failed to establish any viable ground warranting habeas relief.

Accordingly, it is hereby **ORDERED** as follows:

1. Lenard Dixon's petition for a writ of habeas corpus [R. 1] is **DENIED**.

2. The Court will enter judgment contemporaneously with this Order.

3. This matter is **STRICKEN** from the docket.

Entered:  April 22, 2022.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY